| UNITED STATES DISTRICT COURT | SOUTHERN DISTRICT OF TEXAS |
|---|---|

In re: Grand Jury Subpoena, §
§
           Plaintiff, §    Miscellaneous Action H-11-174
§
Dated February 11, 2011 §    SEALED
§
§

## Opinion on Denial of Compulsion

1.    *Introduction.*

The government has asked this court to compel a man to produce documents. Because his privilege against self-incrimination protects him, production will not be compelled.

2.    *Background.*

The government is investigating *the citizen*[*] for crimes under the tax code and Bank Secrecy Act. On February 25, 2011, *the citizen* received a grand-jury subpoena for records of his foreign bank accounts. Nineteen days later, he invoked his privilege against self incrimination, telling the government that he declined to comply. The government has asked this court to compel him to produce his records.

3.    *Bank Secrecy Act.*

Congress passed the Bank Secrecy Act in 1970. Its purpose is to give "law enforcement authorities with greater evidence of financial transactions in order to reduce the incidence of white-collar crime."[1] The statute declares that its purpose is "to require certain reports or records where they have a high degree of usefulness in criminal, tax, or regulatory

---

[*] Name redacted.

[1] Sen. Rep. No. 91-1139 (1970).

investigations."[2] The act requires American citizens who do business with foreign financial institutions to keep records and to report yearly.[3]

The government says that, by electing to have foreign bank accounts, *the citizen* has waived whatever privilege he may have; because he knew that the government requires him to keep the records, by generating the papers he consented to produce them. Disclosure is a condition of participating in the regulated activity.

Over the years, courts have accommodated the regulatory-prosecutorial state by allowing this so-called "required-records exception" to the Constitution's strictures on governmental intrusion. This exception applies when (a) the purposes of the United States' inquiry are essentially regulatory, (b) the records are those kinds that are customarily kept, and (c) the records themselves must have assumed "public aspects" rendering them parallel to public documents.[4]

That *the citizen's* records are of a kind customary kept is not contested. In application, the third element – public aspects – is a restatement of the requirement that the reporting scheme be essentially regulatory – non-criminal – in purpose.

4. *Customary.*

By the logic of this exception, the constitutional privilege would tend to apply only to exceptional or peculiar records – not to letters, receipts, deeds, or balance sheets. The Constitution does not protect types of papers and effects; it protects their contents.

5. *Public Aspects.*

In its essence, the government says that records privately kept become public the moment the government requires them to be kept and, being public, become available on request. When the government requires you to report to it, all of the predicate records are as public as the filing.

---

[2] 31 U.S.C. § 5311.

[3] 31 U.S.C. § 5314; 31 C.F.R. § 1010.420 &1010.350.

[4] *Grosso v. United States*, 390 U.S. 709, 713 (1968).

In plain language, some records are public: marriage licenses, recorded deeds, and 10-Ks. Their function is public notice, and they are both available to the real, general public and publically owned. *The citizen's bank account records are not filed in a court house or submitted to a governmental agency for public posting.* These papers are private – between the bank and him – kept for his use. If these papers were authentically public, "the public should have the same right that the government has to peruse, if not to use, them."[5]

The government says that if Congress says to keep your correspondence, your letters are public. That these papers are business records supports no distinction under the Constitution between them and papers on politics or love. Presumably, George Mason did not include in the Constitution's text an exception for documents that the government thought could be significant to it because that would make the text empty. The government's progression is, if the government asserts an interest in a document, it is imbued with public aspects and is unprotected by the Constitution.

In his dissent to *Shapiro v. United States*, Justice Frankfurter observed that "if records merely because required to be kept by law *ipso facto* become public records, we are indeed living in glass houses."[6] Documents that are required to be kept are not accessible to the government for that reason.

6.  *Requirement's Purpose.*

The government relies on *Shapiro v. United States*; it repeats its formula. When the government has an essential regulatory system and when it obliges citizens to record their activities, those records are fused with the public interest and its machinery. In short, if the government claims a good reason to have the records kept, they become public-like, constitutionally naked.

Once the Supreme Court said that the Emergency Price Control Act's records kept by citizens were public because they were integral to a valid regulation – stabilizing prices – and that the constitutional privileges did not attach. It said that "there is an important difference in the constitutional protection afforded their possessors between papers *exclusively* private and

---

[5] *Shapiro v. United States*, 335 U.S. 1, 55 (1948) (Frankfurter, J., dissenting).

[6] *Id.* at 37.

documents having public aspects."[7] As a licensee under the Price Control Act, Shapiro was required to keep the records, giving them "public aspects." This is simply the argument of necessity, of which the younger William Pitt justly observed "Necessity is the plea for every infringement of human freedom. It is the argument of tyrants; it is the creed of slaves.[8]

    A.    *Government's Interest.*

To support its contention that the requirements to keep records in the Bank Secrecy Act are primarily regulatory, the government says the duty to file yearly reports makes the statute's goal public.

In the hearing, it said that the yearly reports help the Treasury monitor the money supply. It conceded that the reporting requirements would apply to an inherited South-African bank account or the proceeds of the sale of Norwegian land. Reporting those transactions would not help the financial agencies manage the money supply.

Critically, the government does not manage the money supply or currency flows of the world's largest economy by annual reports from individual citizens. The government through the Federal Reserve Board has daily, official reports from banks that have aggregate data. Similar compilations are gathered by a variety of agencies in direct connection to their work of funding, insuring, or other fiscal and financial responsibilities.

The government urged that it also regulated banks by this statute. It confessed that its "regulation" was not concerned with bank solvency but with the banks being used for crime. The government's regulatory justifications have no rigor, no substance. They are but smoke and mirrors for its real concern: crime.

Other than gathering data to confirm whether its citizens are evading taxes through overseas accounts, the act has no substance – not in having its own regulatory function nor in assisting other regulators. The statute does not restrict overseas investment. It does not dictate how or why Americans can move their assets elsewhere. Unlike the Price Control Act, foreign account holders are not required to have a federal license in order to invest overseas. Unlike the Price Control Act, it was not a wartime measure in our struggle against tyrannies east and

---

[7]*Id* at 34.

[8]William Pitt the Younger, Remarks to the House of Commons (Nov. 18, 1783).

west. Back then, we did extraordinary things and constitutionalized many of them. Ask Toyosaburo Korematsu.[9]

When it passed the Act, Congress focused on the role of foreign accounts in crime. The national legislature reacted to claims about foreign accounts' associated crime. National liquidity and stable prices were not evaluated much less enacted. The regulatory justification the government uses is false. Were it true, the government wants to look at the records to indict him for tax evasion or something – something other than for not filing the reports. The Act's own declaration says it is "to require certain reports or records where they have a high degree of usefulness in criminal, tax, or regulatory investigations."[10] When asked about foreign accounts opened in assumed names, the government said doing so "is almost always done for tax evasion purposes." The Court of Appeals for the Fifth Circuit has concluded that there had been "a presumption by Congress that secret foreign bank accounts and secret foreign financial institutions are inevitably linked to criminal activity in the United States."[11] The government instituted the reporting requirement not to regulate its citizens with business abroad but to catch crooks.

B.    Suspect Segment.

While having an account with a foreign financial institution is not in itself illegal, the Act assumes a high correlation between American crime and foreign accounts. The theme of the Senate's report is that foreign bank accounts abet illegal behavior. The Senate fretted about the "growing use of secret foreign bank accounts for a wide variety of illegal purposes by U.S. citizens and residents . . . . Tax evaders, stock swindlers and other white-collar criminals are becoming increasingly aware of the advantages of a secret foreign bank account."[12]

That is high drama, low thought. All people are required to keep records and report yearly. Congress made no attempt to find a pattern that would have justified an intrusion. It is true that, if everyone is obliged to report his foreign account, the government may more easily

---

[9]See Korematsu v. United States, 323 U.S. 214 (1944).

[10]31 U.S.C. § 5311.

[11]United States v. Hajecate, 683 F.2d 894, 901 (5th Cir. 1982).

[12]Sen. Rep. No. 91-1139 (1970).

catch crooks. On the other hand, if the government were to search all homes, they would undoubtedly discover and prosecute crimes. The sophisticated white-collar criminals and tax evaders at whom the government aimed its record-keeping requirement are a very small, highly select segment of the public who control accounts at foreign financial institutions.

The statute's defects as a general regulation may not invalidate it as a policy choice, but they do defeat it as a tool to invalidate the right against self-incrimination.

### C. *Use of the Data.*

The data gleaned from yearly reports and the records are used to ascertain whether the citizen is a crook. While the government named other illusory uses for the yearly reports, in the hearing it could not enunciate reasons it would ask for a person's records other than for criminal investigations. The government requests the records from people only when it suspects wrongdoing, as it suspects *the citizen.* It demands their records only when it is investigating them. Investigations are done to ascertain whether crime has been committed. No episodic review of a few reports each year allows the government to manage the currency or project tax revenues.

Tellingly, when the government was ordered to disclose the number of records it has demanded in recent years and the purpose for those demands, the government said it did not know. It knew neither the frequency, volume, or purpose. The government requires its citizens to maintain their records because they are related to an essential regulatory function, but it apparently does not require itself to keep data on its uses of the information.

### 7. *Voluntariness.*

The government said that because having foreign accounts is voluntary, those with them have waived their privilege in their records. Life in general is full of "voluntary decisions" such as whether (a) to drive a car, (b) to own a home, (c) to buy a toy, or (d) to deposit money in a bank. If the proper statutes were passed, the government's rationale could require all (a) drivers to consent to having their car searched at home and on the road, (b) homeowners to waive their constitutional safeguards of their papers and effects, (c) toy buyers to have their houses searched for non-conforming playthings, and (d) all domestic bank depositors to waive whatever privileges they may have in the account information.

The national government regulates nearly every aspect of life. It may not eviscerate the limits on its authority under the Constitution by turning every regulated choice into a constitutional waiver.

8. *Conclusion.*

The government's motion to compel the production of *the citizen's* foreign account records will be denied.

Signed on September 21, 2011, at Houston, Texas.

Lynn N. Hughes
United States District Judge